**SO ORDERED.**

**SIGNED this 26th day of February, 2018.**




Dale L. Somers
United States Bankruptcy Judge

_____

Opinion designated for electronic use, but not for print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

**LENEXA HOTEL, L.P.,**

                    **DEBTOR.**

**CASE NO. 16-22172
CHAPTER 11**

### MEMORANDUM OPINION AND JUDGMENT GRANTING DEBTOR'S MOTION TO DISMISS AFTER GRANTING MOTION FOR RECONSIDERATION AND ESTIMATION OF SECURED CLAIMS

This memorandum addresses two competing motions — Debtor's Motion to

Dismiss Chapter 11 Case and Close Case[1] and the Motion of Holiday Hospitality

Franchising, LLC to Convert Debtor's Case to Chapter 7.[2]  The Court has jurisdiction.[3]

_____

[1] Doc. 155.

[2] Doc. 165.

[3] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the

Multiple hearings have been held.  The appearances have been as follows.[4]  Debtor Lenexa Hotel, L.P., appeared by Jeffrey A. Deines and Carl R. Clark of Lentz Clark Deines PA.  CoreFirst Bank & Trust, Debtor's secured lender, who supports dismissal, appeared by R. Patrick Riordan and Luke P. Sinclair of Riordan, Fincher, Sinclair & Beckerman, PA.  Holiday Hospitality Franchising, LLC appeared by Leib M. Lerner of Alston & Bird LLP and Leslie A. Kulick of the Law Office of Leslie A. Kulick.  Stephen J. Craig and Ventura Hotel Corporation, who support dismissal, appeared by Todd W. Ruskamp and William R. Sampson of Shook, Hardy & Bacon, L.L.P.  The United States Trustee, who supports dismissal, appeared by Alice N. Page.

**BACKGROUND FACTS**.

Debtor filed a voluntary petition under Chapter 11 on November 1, 2016.  Debtor is a Kansas limited partnership that owns and operates a hotel located in Lenexa, Kansas.  Ventura Hotel Corporation (Ventura) is a general partner and owns a 61 percent interest in Debtor.  Steven J. Craig (Craig) is the limited partner, owning a 39 percent interest in Debtor.  Ventura is owned by Craig.  Debtor has been operating the hotel as a debtor in possession throughout this case.  CoreFirst Bank & Trust (CoreFirst) has a claim that is secured in part by a first priority lien on Debtor's real property, the hotel and an adjacent

---

Code or arising in or related to a case under the Code, effective June 24, 2013.  D. Kan. Standing Order No. 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2016).  Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  There is no objection to venue or jurisdiction over the parties.

[4] Not all the parties have appeared at all the hearings.

lot.  Ventura made numerous advances to Debtor that are secured by a second priority lien on Debtor's real property.  From May 2008 through August 2017, Debtor operated under a franchise agreement with Holiday Hospitality Franchising, LLC (HHF), under the Crowne Plaza brand.  The HHF franchise has terminated, and Debtor currently operates under the Clarion brand.

Debtor's primary assets are the hotel and a claim against HHF in a lawsuit that is pending in the United States District Court for the District of Kansas.  Debtor's Schedule A states that the appraised value of its real property is approximately $13.5 million; the parties do not dispute this value for purposes of the pending motions.  Schedule D lists CoreFirst's claim in the amount of $17 million secured by the real property.  Ventura is listed as the holder of a $13.5 million claim secured by a second lien on Debtor's real property.  HHF filed four proofs of claim totaling in excess of $1.1 million, and it asserts it is Debtor's largest unsecured creditor.  Debtor contends that HHF's claims are contingent because Debtor's claim against HHF in the federal district court litigation exceeds the total of HHF's claims.  Debtor's schedules state there are about 100 unsecured trade creditors whose claims total approximately $510,000.  These claims include $130,00 owed to HHF's predecessor, Intercontinental Group.  Debtor estimates the true unsecured trade debt to be $280,000.

Debtor's hotel has been conducting business during the pendency of this case, and the monthly operating reports show it is operating at a loss.  Debtor has obtained extensions of the exclusive period for filing a plan.  No proposed disclosure statement or

3

plan has been filed.

## GOVERNING LAW AND THE COMPETING MOTIONS TO DISMISS AND TO CONVERT.

The competing motions to dismiss and to convert are governed by § 1112(b)(1) of the Bankruptcy Code.[5]  The relevant portion of that section provides:  "[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  The movant bears the burden of establishing two matters:  that cause exists; and that the chosen alternative, dismissal or conversion, is in the best interests of creditors and the estate.[6]

For purposes of § 1112(b), the statute defines "cause" to include a non-exclusive list of 16 circumstances, the first of which is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[7]  The parties agree that cause is present, and this conclusion is amply supported by Debtor's monthly operating reports for November and December 2016, and January through May 2017 that show continuing losses from operations.  Debtor has determined

---

[5] 11 U.S.C. § 1112(b).  Future references to title 11 in the text shall be to the section number only.

[6] See 7 *Collier on Bankruptcy*, ¶ 1112.04[4] at 1112-22 (Richard Levin & Henry J. Sommer, eds.-in-chief, 16th ed. 2017).

[7] 11 U.S.C. § 1112(b)(4)(A).

4

that the hotel must be sold, and HHF has not challenged this determination. Neither party seeks the appointment of a Chapter 11 trustee, and the Court agrees that such an appointment would not be in the best interests of creditors and the estate.

Once cause for relief has been found, and the appointment of a trustee is removed from consideration, the Court must choose between dismissal and conversion. The Code does not state the applicable criteria, and the Court is given broad discretion. Case law has developed a list of ten factors which the Court should consider when balancing the alternatives. The Court has adopted the formulation stated by Bankruptcy Judge Nugent in *Helmers.*[8]

When moving to dismiss on August 8, 2017, Debtor argued that dismissal is in the best interests of creditors and the estate because a sale of the hotel is necessary and the sale can best be accomplished outside of bankruptcy. At that time, Debtor, Craig, and Ventura had agreed to a work-out agreement to settle CoreFirst's claim based on notes owed by the Debtor and Craig. The agreement was contingent on dismissal of the case. The agreement required the sale of the hotel before December 29, 2017, for an amount sufficient to pay Debtor's obligations to CoreFirst in full, or if the sale did not occur, the giving of a deed to the property to CoreFirst. The Court has been advised that the 2017 work-out agreement is no longer in effect and there is no new agreement, so this is no longer a factor for the Court's consideration.

---

[8] *In re Helmers*, 361 B.R. 190, 196-197 (Bankr. D. Kan. 2007) (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[6] (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 15th ed. rev. 2005)).

5

In addition to arguing that dismissal was in the best interests of creditors and the estate because it would allow for the performance of the work-out agreement, Debtor argued against conversion on other grounds. Conversion would result in additional administrative expenses and most likely in termination of the hotel's operations, causing a loss of value of the asset and the loss of jobs. Debtor's second principal asset, its claim against HHF, is being liquidated in the district court, so liquidation does not require the continuation of the bankruptcy case. After a dismissal, all creditors would retain their rights under state and federal law to collect from Debtor.

CoreFirst supported dismissal and the sale of the hotel outside of bankruptcy. It asserted that it has a claim of approximately $21 million, secured by five mortgages on Debtor's real property and that its first priority liens encumber the full value of the property, estimated to be $13.5 million. In the alternative, and in response to HHF's argument that two of CoreFirst's mortgages are not effective to secure its claim, CoreFirst argued that if its claim is secured by only three of its five mortgages, the amount of its secured claim still exceeds $14 million, so that after satisfaction of that claim, there would be no equity available for other creditors. CoreFirst has not advised the Court of any change in its position since the expiration of the work-out agreement.

HHF responded that conversion to Chapter 7, not dismissal, is in the best interests of creditors and the estate. It argued that conversion would result in benefits to the unsecured creditors because: Only a Chapter 7 trustee could claw back unapproved post-petition professional fees and loans; only a Chapter 7 trustee could examine and possibly

6

subordinate insider claims; an examination by a Chapter 7 trustee could reveal that some of CoreFirst's mortgages do not secure its claim; and conversion would halt monthly management and professional fees that are currently being paid.

The United States Trustee supported dismissal.

**HEARINGS**

**A. September 8, 2017 nonevidentiary hearing on competing motions, and oral ruling on September 29, 2017.**

After notice, the Court held its first hearing on the competing motions on September 8, 2017, when it heard extensive arguments on the motions. There was no request for discovery or for an evidentiary hearing. At the close of the hearing, the parties and the United States Trustee were granted leave to file additional briefs. Briefs were filed by Debtor, HHF, and CoreFirst. In addition, CoreFirst filed a proof of claim for $20,785,920.06, comprised of a secured claim of $13,490,000, the value of Debtor's real property, and an unsecured claim of $7,295,920.06.[9]

On September 29, 2017, during a telephonic hearing, the Court announced its findings of fact and conclusions of law.[10] Based on consideration of the relevant factors from *Helmers*, the Court concluded that dismissal would be in the best interests of creditors and the estate. The Court's findings of fact and conclusions of law were incorporated into an Opinion and Judgment Granting Debtor's Motion to Dismiss and

---

[9] Proof of Claim 21.

[10] The transcript of the oral ruling is doc. 205.

7

Denying Holiday Hospitality Franchising, LLC's Motion to Convert to Chapter 7 that was filed on October 3, 2017.[11]

**B. HHF's Motion for Reconsideration and the October 19, 2017 Hearing on the Motion**.

HHF filed a motion for reconsideration on October 10, 2017.[12]  HHF argued that the Court erred when granting the motion to dismiss because it:  (1) improperly relied on CoreFirst's proof of claim that was filed after the hearing on the competing motions; (2) mistakenly construed the work-out agreement between Debtor, CoreFirst, and Craig; and (3) should have held an evidentiary hearing before ruling on the competing motions. Debtor[13] and CoreFirst[14] opposed reconsideration.  HHF also filed an objection to CoreFirst's proof of claim.[15]

Arguments on the motion to reconsider were heard at a telephonic hearing on October 19, 2017.[16]  HHF argued that (1) under Kansas law, there were grounds to question CoreFirst's secured claim, both the amount of interest allegedly owed and whether all of CoreFirst's five mortgages secured the claim; and (2) if the secured amount was substantially less than the value of Debtor's real property and the case were

---

[11] Doc. 202.

[12] Doc. 207.

[13] Doc. 222.

[14] Doc. 224.

[15] Doc. 195.

[16] The transcript of this hearing is Doc. 231.

8

converted to Chapter 7, assets would be available to pay unsecured claims. Debtor pointed out that this scenario ignored Ventura's second-priority secured claim. HHF responded that Ventura was an insider, and that if a Chapter 7 trustee were appointed, HHF believed Ventura's claim would either be disallowed or subrogated.

The Court granted the motion to reconsider. It pointed out that when it granted the motion to dismiss, HHF had clearly waived any right to an evidentiary hearing. It further noted it had relied on statements of CoreFirst's counsel in the bank's brief about the amount of the bank's secured claim if only three of its five mortgages secured its claim, rather than on the bank's post-hearing proof of claim. Nevertheless, the Court found that HHF's challenges to the estimated amount of CoreFirst's secured claim could have merit and should be considered. The Court ruled that an evidentiary hearing would be held on one issue, estimating the amount of CoreFirst's secured claim, and if necessary, a subsequent evidentiary hearing would be held to estimate Ventura's secured claim. With respect to the other ground for reconsideration, the Court held that any misunderstanding of the work-out agreement was not material to its decision to dismiss.

### C. October 31, 2017 Evidentiary Hearing on Estimating CoreFirst's Claim and November 27, 2017 Oral Ruling.

The evidentiary hearing to estimate CoreFirst's claim was held on October 31, 2017. In an oral ruling made on November 27, 2017, the Court held that the total estimated secured claim Debtor owed CoreFirst as of the date of filing was approximately $11,600,000, which was approximately $1,900,000 less than the estimated value of

Debtor's real property.[17]

Given this conclusion, the Court further held that before it could reconsider the balancing of the factors relevant to choosing between dismissal and conversion, the extent of the liens held by creditors other than CoreFirst must be estimated. Debtor's Schedule D includes a $13,540,477 claim of Ventura secured by a second priority lien on Debtor's real property, the same property that secures CoreFirst's claim. Since HHF challenged whether Ventura's claim should be estimated at this amount, the Court scheduled an evidentiary hearing to determine if Ventura's estimated secured claim exceeds $2 million so that in a hypothetical Chapter 7 liquidation, Debtor's real property would be fully encumbered, as the Court had assumed when granting the motion to dismiss.

### D. January 17, 2018 evidentiary hearing and decision estimating the amount of Ventura's secured claim.

### 1. The Evidence.

An evidentiary hearing on the estimation of Ventura's secured claim was held on January 17, 2018, after the completion of limited discovery. HHF's position was that Ventura's claim should be estimated as having no value because: (1) Since Ventura is the

---

[17] More specifically, the Court held that: (1) CoreFirst was entitled to collect interest at the default rate of 18% from July 31, 2014, the date it received Debtor's last payment on the note, rejecting HHF's contentions that the loan documents required a notice of default before Corefirst was entitled to charge the default rate and that Corefirst had waived its right to the default rate by its conduct; (2) the terms of two leasehold mortgages granted to CoreFirst before Debtor acquired ownership of the fee interest in the hotel property were insufficient to sustain CoreFirst's position that the leasehold mortgages converted to fee mortgages when Debtor acquired the hotel property; and (3) CoreFirst's three fee mortgages secured the principal sum of $7,477,000, plus interest of $4,065,355 and late fees of $57,518.35. The transcript of this oral ruling is Doc. 252.

10

general partner of Debtor, under Kansas partnership law its claim is subordinated to those of other partnership creditors; (2) the advances Ventura made to Debtor should be recharacterized as equity investments; and (3) if they are not recharacterized, Ventura's claim should be subordinated to the claims of other creditors. Based on the following findings of fact and conclusions of law, the Court rejects HHF's contentions and holds that for purposes of ruling on the competing motions, Ventura will be considered to be the holder of a secured claim in an amount greatly exceeding any equity that might remain in Debtor's real property after the allowance of CoreFirst's secured claim if this case were converted to Chapter 7.

Debtor has owned and operated a full-service hotel in Lenexa, Kansas, since Debtor's formation in 1982. Debtor's original general partner was Linquist & Craig Hotels & Resorts, Inc. In 2006, Ventura become the general partner and Craig the limited partner. Debtor is a party to a Management Agreement dated May 1, 2009, with SJC V, LLC, under which SJC V provides management services for the operation of the hotel. Debtor and SJC V are also parties to a Technical Services Agreement dated March 1, 2008, pursuant to which SJC V provides additional management services. Craig is the owner of SJC V.

Since June of 2003, CoreFirst has been Debtor's primary lender. Funds CoreFirst provided were used to upgrade the hotel when it was converted to a Crowne Plaza in May 2008 and for ongoing operating expenses. However, from time to time starting in 2009 and continuing through the Chapter 11 proceedings, additional operating funds were

11

needed and were advanced to Debtor by Ventura. Each advance was recorded on the books of Debtor and Ventura, reflected on the parties' respective bank records, and evidenced by a contemporaneously executed promissory note. The notes required payment of interest at 9% and were payable on demand. Most of the loan proceeds were used for operating expenses, not capital expenditures.

On December 29, 2010, Debtor executed a Second Mortgage of its real property in favor of Ventura to secure an attached promissory note for $3,642,634.81. This note was a consolidation of the loans Ventura made to Debtor through mid-year 2010, as evidenced by a series of contemporaneous promissory notes. On April 30, 2012, Debtor executed a Third Mortgage of its real property on favor of Ventura in the amount of $2,264,991.52, as shown in an attached note that was a consolidation of the notes for advances to Debtor since the execution of the Second Mortgage. The Third Mortgage secured a maximum principal of $4 million and included a future advance clause.

Craig testified that he advanced the funds to Debtor through Ventura for several reasons. The hotel was a good operation in a good location. Funds were needed for its continued operation. If the hotel were not operational, it would have been a problem for Craig, CoreFirst, approximately 60 to 65 hotel employees, and vendors. Craig's involvement in management did not change as a result of the loans. Although Ventura never demanded payment of the loans, Craig expected them to be repaid. Until 2012, based on his experience, Craig believed that the operational problems, including the problems which Debtor experienced under the HHF franchise agreement, would be

corrected.

From May 2008 through August 2017, $3.6 million in licensing fees were paid to HHF. Some of the loans from Ventura enabled Debtor to make these payments. Ventura was audited by the IRS for tax years 2004, 2006, 2009, 2010, and 2011. Craig was never advised that the IRS questioned the characterization of Ventura's advances to Debtor as loans.

Craig testified that he is engaged in negotiations to sell the hotel even though the work-out agreement with CoreFirst has expired.

Debtor's schedules report payments, distributions, or withdrawals within one year of the filing of the case to Craig as an insider of Debtor. Debtor's motion for authorization to continue using existing bank accounts and banking systems states:

> 8. . . . The [operating account at CoreFirst] receives credits from all credit card transactions, and daily deposits of cash and checks. If a loan is approved from Ventura Hotel Corporation, the funds are transferred from the Ventura Hotel Corporation to this account internally via online banking. . . . .
>
> 11. Debtor funds regular payments to SJC V LLC in the amount of $16,666.67 on the 7th and 22nd of each month. These payments represent management fees, accounting fees, and fees under the TSA (collectively, "Management Fees") under which SJC V, LLC provides management and technical services to the Debtor. Debtor believes these management and technical services fees are fair, reasonable and within customary ranges for the industry. SJC V, LLC, in turn, transfers funds for the Management Fees to SJC III, LLC, which in turn remits funds directly to Stephen J. Craig. Debtor hereby requests authority to continue to make distributions for these Management Fees.

13

> 12.  From time to time, Lenexa Hotel, L.P. will transfer funds
> back to the Ventura Hotel Corporation operating account to
> cover monthly bank fees or checks that Ventura Hotel
> Corporation has written since Ventura Hotel Corporation does
> not have any incoming cash except when capital contributions
> are made.[18]

HHF's expert, an accountant, computed that payments Debtor made to Craig entities, such as SJC V, for the period from 2010 through 2017 totaled $5,900,673.44, and the deposits from Craig entities to Debtor totaled $291,692.26.  For the same period, payments Ventura made to Debtor totaled $4,841,245.43, and payments Debtor made to Ventura totaled $272,878.49.[19]

In addition to Craig, the fact witnesses included Debtor's outside accountant and Debtor's controller.  In addition to the notes, the mortgages, and the relevant agreements, the exhibits included Debtor's and Ventura's balance sheets and profit-and-loss statements for the years ending in 2013 and 2016, and bank statements for both entities for numerous years.  No instance was brought to the Court's attention where a purported Ventura loan to Debtor was not supported by a note and the bank statements.  From a review of these exhibits and the testimony of the witnesses, the Court concludes that Ventura and Debtor maintained accurate, contemporaneous, and internally consistent records concerning the loan transactions.

## 2. Analysis

---

[18] HHF exh. 56 at 2-4.  The motion was approved without objection.  Doc. 68.

[19] HHF exh. 109 at 2.

14

### a. Ventura's claim should not be valued at zero because Ventura is the Debtor's general partner and liable for all its debts.

HHF's first argument is purely legal. It asserts that converting this case to Chapter 7 would "unleash"[20] Debtor's real property, in which Ventura claims a perfected mortgage lien, for the benefit of its creditors because § 723 would become applicable. That section provides the Chapter 7 trustee of "a partnership with a claim against the general partners in the partnership for any deficiency remaining after administration of the partnership's chapter 7 estate."[21] Debtor is a limited partnership, and Kansas law provides that a general partner of a limited partnership is usually liable for the partnership's debts.[22] Further, as HHF points out, section 3.2(a) of Debtor's Restated Agreement of Limited Partnership states in part: "[Ventura] hereby agrees to expose all of its assets to the Partnership's liabilities and to undertake all of the obligations of a general partner of the Partnership."[23]

On the other hand, there is no question that the general partner of a Kansas limited partnership may make secured loans to the partnership and be entitled to payment to the same extent as other creditors. K.S.A. 56-1a107, a section of the Revised Uniform

---

[20] Doc. 279 at 5.

[21] 6 *Collier on Bankruptcy*, ¶ 723.02[1] at 723-5.

[22] *See* K.S.A. 56-1a253(b) and 56a-306(a).

[23] HHF exh. 64 at 4. HHF also cites section 8.1, which states: "Each Partner shall have a fiduciary duty to the Partnership and, consistent with the nature of his interest and to the extent of his partnership relationship with the other Partners, to the other Partners." *Id*. at 8.

15

Limited Partnership Act, provides, "[e]xcept as provided in the partnership agreement, a partner may lend money to and transact other business with the limited partnership and, subject to other applicable law, has the same rights and obligations with respect thereto as a person who is not a partner."[24] When the affairs of a limited partnership are wound up, the assets are distributed first to "creditors, including partners who are creditors."[25] The Court notes that the Kansas case law HHF cites involved different circumstances than those in this case, and does not support its argument that Ventura should be liable for Debtor's unsecured claims before Ventura's own secured claim is paid.[26]

Section 723 on which HHF relies limits the Chapter 7 trustee's claim to "any deficiency remaining after administration of the partnership's chapter 7 estate." Contrary

---

[24] K.S.A. 56-1a107. This section leaves to "the fraudulent conveyance laws of the jurisdiction in question and to the provisions of the Bankruptcy Code to determine whether provision of security with respect to partner loans, and the repayment of partner loans, is appropriate." J. William Callison and Maureen A. Sullivan, Partnership Law and Practice: General and Limited Partnerships, § 24:7 (2017) (available on Westlaw).

Further, under Kansas law, a general partner of a limited partnership, such as Ventura, "has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners." K.S.A. 56-1a253(a). The Kansas Uniform Partnership Act requires partnerships to reimburse partners for payments made in the ordinary course of the business of the partnership or for the preservation of its business, and for advances to the partnership beyond the amount of capital the partner agreed to contribute. K.S.A. 56a-401(c) and (d). A payment made by a partner which gives rise to such a partnership obligation "constitutes a loan to the partnership which accrues interest from the date of the payment." K.S.A. 56a-401(e).

[25] K.S.A. 56-1a454(a).

[26] *Monarch Normandy Square Partners v. Normandy Square Assocs. Ltd. Partnership*, 817 F. Supp. 919 (D. Kan.. 1993), cited by HHF, concerned the construction of a promissory note in which the partners of a limited partnership agreed to pay accounts receivable, security deposits, prepaid rents, and expenses to the holder. *Gaynes v. Wallingford*, 185 Kan. 655, 347 P.2d 458 (1959) held that when the affairs of a partnership are in the course of administration by a court, the creditors of the partnership have a claim to partnership assets prior to that of a creditor of an individual partner.

16

to HHF's argument, the section provides no basis to "unleash" Debtor's property from Ventura's secured claim; that claim would be satisfied, at least in part, during the administration of the Chapter 7 case, before maturity of the trustee's claim under § 723. Further, § 723 does not create rights; its merely allows the trustee to enforce rights under state law. The rights which the trustee could enforce would be the same rights that such creditors could enforce under Kansas law even if the case is dismissed.

The Court concludes that a Chapter 7 trustee's rights under § 723 do not provide a reason to convert the case rather than dismiss it.

### b. Ventura's claim should not be recharacterized as equity.

Although the Bankruptcy Code does not expressly address recharacterization, the Tenth Circuit has held that "the authority to recharacterize putative debt as equity arises from a court's general equitable powers under 11 U.S.C. § 105(a)."[27] When a debt claim is recharacterized, funds transferred to the debtor are no longer considered to be a loan that must be repaid in bankruptcy proceedings as a debt, but instead are treated as a capital contribution.[28] The practical effect is subordination, since capital contributions can be satisfied only after all other obligations.[29] When exercising authority to recharacterize a debt as equity, the Court must apply a 13-factor test, which reflects "the

---

[27] *Redmond v. Jenkins (In re Alternate Fuels)*, 789 F.3d 1139, 1146 (10th Cir. 2015) (citing *In re Hedged-Investments*, 380 F.3d 1292, 1298 (10th Cir. 2004)).

[28] *Id*. at 1147.

[29] *Id*. (citing *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 749 (6th Cir. 2001)).

17

characteristics of an arm's length negotiation."[30]  The Court therefore turns to an examination of these factors.

Factor 1:  "the names given to the certificates evidencing the indebtedness."  Each of the certificates is named "Promissory Note."  Each was executed substantially contemporaneously with an advance of funds to Debtor.  The bank and accounting records of Debtor and Ventura report the transactions as loans.  The lien documents are named "Second Mortgage" and "Third Mortgage," thereby reflecting an awareness of CoreFirst's previously filed mortgages.  This factor strongly supports treating the advances as loans.

Factor 2:  "the presence or absence of a fixed maturity date."  The promissory notes are payable on demand, but they do have a fixed rate of interest.  The absence of a fixed maturity date or a repayment schedule is indicative of an equity investment.

Factor 3:  "the source of [principal] payments."  If payments to Ventura were made, they came from Debtor's earnings.  In the long term, the prospect of repayment depended on the success of the hotel.  This factor favors an equity finding.

Factor 4:  "the right to enforce payment of principal and interest."  The promissory notes provide the entire unpaid principal and accrued interest are payable on demand.  Further, the mortgages provide that Ventura may pursue its remedies if there is a payment default or other breach of the loan documents.  This is indicative of true secured loans.

---

[30] *Id.* at 1149.

Factor 5: "participation in management flowing as a result" of the advances. Craig's participation in the management of Debtor did not change as a result of the Ventura loans. Craig participated in the management through SJC V before and after the making of the loans. This is indicative of true loans.

Factor 6: "the status of the contribution in relation to other corporate creditors." Subordination of advances to loans made by other creditors indicates capital contributions.[31] The promissory notes were not subordinated to the claims of other creditors. Ventura's mortgage lien on Debtor's real property is stated to be lower in priority than CoreFirst's mortgages, but this merely reflects the fact that CoreFirst's mortgages were recorded before Ventura's.

Factor 7: "the intent of the parties." The testimony of the witnesses, the loan documentation, and the accounting records of Debtor and Ventura evidence that they intended the advances to be loans. HHF argued in its pretrial brief that the "evidence will show that the circular structure of capital infusions by Craig to Ventura, 'loans' by Ventura to Debtor, and management fees paid by Debtor to SJC were simply for Craig to enjoy tax benefits, not to provide a real loan."[32] But the evidence does not support this assertion. HHF failed to present evidence of any tax benefit Craig obtained. The manner in which Craig was compensated for management of the hotel did not change when the

---

[31] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752.

[32] Doc. 279 at 12.

19

loans were made. Management was required to operate the hotel, and it is not inherently wrong for an insider to be compensated for such services with borrowed funds.

HHF also erroneously asserts that "[t]he motivation behind classifying as loans the transfers from Ventura to Debtor is highlighted by the promissory notes that post-date the Third Mortgage, which [are not secured because they] were never 'rolled-up' into any subsequent mortgage and do not describe any sort of lien or security interest in the Debtor's property."[33] Under Kansas law, a future advance clause in a mortgage operates to secure future advances of the same kind and character as the obligations originally secured, even though the subsequent notes do not refer to the mortgage instrument.[34] The promissory notes executed after the Third Mortgage were of the same kind and character as those originally secured by the mortgage, so they are secured by the Third Mortgage. They do not suggest that an equity investment was intended.

Factor 8: "'thin'" or adequate capitalization." HHF argues that Debtor was thinly capitalized because after 2009, it continually needed cash. The cause of Debtor's cash needs is an issue in the District Court litigation pending against HHF. Although the long history of operation of the hotel suggests that Debtor was adequately capitalized, the Court has insufficient evidence to make a finding on the adequacy of its capitalization. Further, the Tenth Circuit has warned against placing too heavy an emphasis on this

---

[33] Doc. 279 at 12. The Court understands HHF to be arguing that the promissory notes executed after the Third Mortgage are not secured by the mortgage, thereby indicating that they were not intended to be true loans.

[34] *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 601, 647 P.2d 1268, 1273 (1982).

20

factor. To do so "would create an 'unhealthy deterrent effect,' causing business owners to fear that, should their 'rescue efforts' fail, a court will 'give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.'"[35] This factor does not support recharacterization.

Factor 9: "the identity of interest between the creditor and stock holder." Here, there is an identity of interest between Ventura and Debtor because Ventura is both the lender and the general partner of Debtor. Also, Craig is the owner of Ventura and the limited partner of Debtor. This factor supports recharacterization, but only minimally. The Tenth Circuit has cautioned against recharacterizing advances when they were made by the sole owner of a struggling company:

> We see no reason to assume that all funds transferred to a business owned by a single stockholder must be in the nature of equity. To be sure, there may be circumstances where a single stockholder may infuse equity to finance fixed assets or expand the business. But absent some conscious purpose, and given the nature of recharacterization, we question why a holder of all of a company's stock would make additional equity investments in exchange for no additional equity; after all, one cannot own more than all of a company's stock.[36]

The Court rejects HHF's argument that because the notes are held by an insider, they should be recharacterized even though there is no evidence of overreaching or inequitable conduct.

---

[35] *In re Alternate Fuels*, Inc., 789 F.3d at 1152 (quoting *In re Hedged-Investments*, 380 F.3d at 1298 n.1).

[36] *In re Alternate Fuels, Inc.*, 789 F.3d at 1151.

Factor 10: "the source of interest payments." In the long term, the prospect of repayment depended on the success of the hotel. This factor favors an equity finding.

Factor 11: "the ability of the corporation to obtain loans from outside lenders." Debtor had a long-term lending relationship with CoreFirst. There is no evidence whether attempts were made to obtain from an outside lender the funds Ventura provided.

Factor 12: "the extent to which funds were used to acquire capital assets." "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[37] The loans Ventura made were generally used for operating expenses, thereby indicating true loans.

Factor 13: "the failure of the debtor to repay on the due date or to seek a postponement." This fact is not relevant since the notes were payable on demand and no demand was ever made.

The Court concludes that recharacterization would be totally inappropriate. In this case, the most important factors — the meticulous records, the documentation, the right to demand payment, the absence of subordination to the claims of other creditors, the intent to make loans, the absence of any change in Craig's involvement in management as a result of the transactions, and the use of the funds for operating expenses — are the hallmarks of arm's-length operating loans.

The Tenth Circuit rejected recharacterization in *Alternate Fuels*, even though a

---

[37] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752.

review of the bankruptcy court's[38] and bankruptcy appellate panel's[39] decisions reveals many more factors in that case than in this case to support recharacterization. The determinative factor for the Circuit in *Alternate Fuels* appears to have been the fact that Mr. Jenkins, who controlled all of the entities involved in the loan transactions, was the sole owner of the businesses. In this case, Craig owns all of the entities involved. The Tenth Circuit encouraged the use of caution when considering whether to recharacterize advances made by sole owners of businesses, stating:

> We have previously declined to hold broadly that 'a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor.' We have been careful not to 'discourage owners from trying to salvage a business' by requiring 'all contributions to be made in the form of equity capital.' Indeed, owners may often be 'the only party willing to make a loan to a struggling business,' and needlessly punishing their efforts is neither 'desirable as social policy' nor required by our precedent.[40]

If this case were to continue under Chapter 7, recharacterization of Ventura's loans to Debtor would only serve to punish Craig for his willingness to help Debtor's struggling business.

### c. Ventura's claim should not be equitably subordinated to unsecured creditors' claims.

Alternatively, HHF argues that in a Chapter 7 proceeding, Ventura's claim would

---

[38] *Redmond v. Jenkins* (*In re Alternate Fuels, Inc.*), 2012 WL 6110429 (Bankr. D. Kan. 2012).

[39] *Redmond v. Cimarron Energy Co. LLC* (*In re Alternate Fuels, Inc.*), 507 B.R. 324 (10th Cir. BAP 2014).

[40] *In re Alternate Fuels*, 789 F.3d at 1152-53 (citations omitted).

23

be subordinated to the claims of unsecured creditors under § 510(c) so that the equity in Debtor's real property not securing CoreFirst's claim would be available to unsecured creditors.  Subsection 510(c) in relevant part provides "under principles of equitable subordination, [the court may] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  Like recharacterization, equitable subordination is to be used sparingly.[41]  "The Tenth Circuit requires three conditions for a court to exercise its equitable subordination power:  '(1) "inequitable conduct" on the part of the claimant sought to be subordinated; (2) injury to the other creditor of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code.'"[42]  "Special emphasis" is placed on whether inequitable conduct has occurred.[43]  There are "three categories of such conduct:  (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego."[44]  Most courts describe the degree of inequitable conduct required as "gross and egregious, tantamount to fraud, misrepresentation, overreaching or spoliation, or involving moral turpitude."[45]  However, when, as in this case, the claimant is an insider, the analysis is "less stringent

---

[41] *Id*. at 1154.

[42] *Id*. (quoting *In re Hedged-Investments*, 380 F.3d at 1300).

[43] *Id*.

[44] *Id*. at 1154-55 (quoting *In re Hedged-Investments*, 380 F.3d at 1301).

[45] *Id*. at 1155 (quoting *In re Eufaula Indus. Auth.*, 266 B.R. 483, 489 (10th Cir BAP 2001)).

[and] the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider."[46]  But insider loans to distressed debtors are not automatically subordinated as contributions to capital because bona fide efforts of insiders to restore the credit of their companies are looked upon with approval.[47]

HHF's inequitable conduct argument is misdirected.  The inequitable conduct required for subordination relates to the transaction which gave rise to the insider's claim.  Here, other than the fact of insider status, HHF's arguments focus on post-petition events, including Ventura's involvement in (1) Debtor's entering into the work-out agreement with CoreFirst, (2) Debtor's use of cash collateral, and (3) Debtor's filing of a motion to dismiss before CoreFirst had filed its proof of claim.[48]  None of the three categories of misconduct recognized by the courts as relevant to subordination focuses on conduct during a bankruptcy case.  There is no evidence of misconduct regarding the prepetition advances Ventura made to Debtor.

HHF complains of the arrangement between Craig, Ventura, Debtor, and SJC V for Debtor to pay Craig for management of Debtor.  Such management services were necessary, and Craig was entitled to compensation for performing them.  HHF and other unsecured creditors who continued to receive payments from Debtor benefitted from Craig's efforts to operate the hotel despite its need for operating funds.

---

[46] *Id*. (quoting *In re Hedged-Investments*, 380 F.3d a 1301).

[47] 4 *Collier on Bankruptcy*, ¶ 510.05[3][c] at 510-25.

[48] Doc. 279, 17.

HHF's subordination argument ultimately rests on the fact that Ventura is an insider of Debtor. Insider status alone is not grounds for subordination. The Court concludes that if this case were converted to a Chapter 7 proceeding, it is highly unlikely that Ventura's claim would be subordinated to the unsecured claims.

### 3. Conclusion about estimating Ventura's claim.

For the foregoing reasons, the Court finds that HHF's arguments do not provide a basis to estimate that in a Chapter 7 proceeding, Ventura's secured claim would be allowed in an amount less than the equity remaining in Debtor's real property after satisfaction of CoreFirst's secured claim. Most likely, the claim would be allowed in an amount substantially equivalent to $13.5 million, the amount which Ventura claims it is owed. The Court finds it highly unlikely that in a Chapter 7 proceeding, either Kansas partnership law, or the doctrines of recharacterization or equitable subordination would provide a basis to reduce Ventura's secured claim to less than approximately $2 million, the estimated amount by which the value of the hotel exceeds CoreFirst's secured claim.

### E. Reconsideration of the balancing of the interests of the estate and creditors under the alternatives of conversion and dismissal does not change the Court's decision that this case should be dismissed.

The Court next examines its analysis of the factors which it previously found favored dismissal. For the following reasons, the Court concludes that the estimations of CoreFirst's and Ventura's claims and the expiration of the work-out agreement do not change the result — dismissal of the case is in the best interests of creditors and the

26

estate.

First, the Court observes that the basic premises supporting dismissal have not changed as a result of the hearings after the motion to reconsider was granted. The hotel still must be sold; the sale proceeds will be maximized by a sale outside of bankruptcy, rather than in Chapter 7; and if the sale took place in a Chapter 7 proceeding, the sale proceeds would likely be less than the estimated claims secured by the property, leaving no equity for the payment of unsecured claims. When initially granting dismissal, the Court estimated that CoreFirst's secured claim would exceed the value of the real property, leaving no value in Debtor's primary asset for payment of unsecured creditors. After two evidentiary hearings, the Court now estimates CoreFirst's secured claim to be less than the value of the real property, leaving some equity beyond that claim, but also estimates Ventura's secured claim to be far in excess of that remaining equity. If the case were converted to Chapter 7, unsecured creditors would be unlikely to receive any distribution attributable to the sale of the real property. In addition, if the Court's claim estimates are correct, in a Chapter 7 case, CoreFirst's and Ventura's unsecured claims would dwarf those of the other unsecured creditors, whom HHF erroneously argues would benefit from conversion.

As previously observed, Debtor's only significant asset other than its real property is its claim against HHF that is being litigated in federal district court. During oral argument following the January 17, 2018 evidentiary hearing, counsel for HHF did not dispute the Court's observation that HHF's motivation for its vigorous opposition to

27

dismissal appears to be to obtain the transfer of control of that litigation to a Chapter 7 trustee. But the Court fails to comprehend how this would benefit unsecured creditors other than HHF. In addition, if the case is dismissed and Debtor obtains a judgment, unsecured creditors could use state and federal law remedies to obtain payment of their claims.

Since the date of the Court's September 29, 2017 order dismissing the case and the January 17, 2018 hearing, the work-out agreement between Debtor, Craig, and CoreFirst expired and it has not been replaced. Debtor's and CoreFirst's arguments in support of dismissal relied significantly on the agreement, and the Court's findings of fact likewise thoroughly discussed it.[49] But examination of the Court's analysis of the factors for consideration when deciding to convert or dismiss show that the work-out agreement was not a significant factor in the decision, and its expiration does not support any change of the Court's conclusion that dismissal is in the best interests of creditors and the estate.

The work-out agreement was mentioned in the following italicized sentences in the combined analysis of factors 1 and 4 and in the analysis of factors 5 and 6. Nothing in the circumstances relevant to the analysis of the additional *Helmers* factors has changed, and the Court incorporates those findings into this opinion by reference.[50]

---

[49] As argued in HHF's motion for reconsideration, the Court may have mischaracterized what would happen under the work-out agreement if the sale of the hotel did not close by December 29, 2017, but any error in this regard has now become irrelevant.

[50] The rulings on the additional factors from Doc. 205 at 12-16 are as follows:

Factor 2 asks whether "would there be a loss of rights granted in

28

With respect to factors 1 and 4, the Court previously stated:

>Factors 1 and 4 are best considered together. Factor 1

the case if there was dismissal rather than converted?" This case is in the early stages of reorganization and no rights have been granted which would be lost by dismissal. This factor favors dismissal.

Factor 3 asks "whether the debtor would simply file a further case upon dismissal." There is no indication that if the case were dismissed debtor would simply file another case. Debtor's dispute with HHF regarding the date of termination of the HHF franchise has been resolved and its dispute with CoreFirst would be settled by the workout agreement. This factor favors dismissal.

. . . .

Factor 8 asks "whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests." HHF suggests that the debtor has engaged in misconduct by representing the payment of pre-petition management fees, making post-petition payments to professionals whose retention was not approved by the Court, and making unapproved loans while in Chapter 11.

The Court is troubled by these allegations. But the Court questions whether an examination by a Chapter 7 Trustee is necessary to protect the interests of creditors. No other creditor has joined in HHF's motion to convert, and the UST supports dismissal.

This case has been on file for less than a year and the amount of money alleged to be involved is not a significant portion of debtor's expenditures. By definition, such alleged wrongdoing . . . will be terminated by dismissal. The alleged wrongdoing is not a reason to deny debtor's request for a dismissal.

Factor 9 asks "whether a plan has been confirmed and whether any property remains in the estate to be administered." No plan has been confirmed . . . and property remains in the estate to be administered. The factors indicate that conversion would be not be futile but is not an important factor favoring conversion.

This Court has got — adds kind of an 11th requirement or factor to be analyzed — and it's already been touched on — but that would be the hardship on a Chapter 7 Trustee to administer this case. There just — the Chapter 7 Trustee would have an undue . . . burden with no readily recognizable assets that it could convert to cash to pay itself later on.

29

asks "whether some creditors receive preferential payment, whether equality of distribution can be better served by conversion rather than dismissal." Factor 4 focuses on "the ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors."

HHF contends that the debtor's insiders received preferential transfers of approximately $717,000 and that a Chapter 7 Trustee could recover up to $360,000 of unauthorized post-petition transfers for legal and accounting fees, unauthorized post-petition loans, and post-petition management fees. Of course, the debtor contends there are valid defenses to such recoveries. This is not the place to resolve those issues.

But assuming such recovery, unsecured creditors would receive only a marginal benefit. This is because if the hotel is sold during a Chapter 7 bankruptcy, the net recovery would likely be less than the value of the property, estimated to be in the neighborhood of 12 to $13 million, leaving CoreFirst with a substantial unsecured claim in excess of $7 million, which would dwarf the other unsecured claims. *But if the case is dismissed rather than converted, CoreFirst will have no unsecured claims and the unsecured creditors will be allowed to attempt to collect from the debtor.*

Depending on which prism one uses and which its looking through to analyze this fact[or], this factor could either slightly favor conversion or slightly favor dismissal. In the Court's mind, Factors 1 and 4 are basically a push.[51]

Since the work-out agreement has expired, there is no basis for the last sentence of the third paragraph (the italicized sentence). Under the present circumstances, if the case is dismissed, CoreFirst (and also Ventura) will have a significant unsecured claim, just as it would in a Chapter 7 case. Factors 1 and 4 remain a "push."

---

[51] Doc. 205 at 11-12.

The Court's prior analysis of factor 5 was as follows:

> Factor 5 asks . . . "whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise." The estate's value as an economic enterprise is dependent upon continued operation of the hotel, which will be sold whether the case is converted or dismissed. *The value is being maximized through the proposed workout agreement with CoreFirst.* If the case is converted, the hotel would cease operations and its value would decline. The administrative costs of a Chapter 7, including the sale price [sic] and the cost a trustee would incur in moth-balling and maintaining a dark hotel, would further reduce the value of the estate. This factor favors dismissal.[52]

The italicized sentence is no longer true. But the analysis remains true if this sentence is omitted. Continued operation of the hotel after dismissal will maximize its value even though there is no work-out agreement, so factor 5 strongly supports dismissal.

With respect to factor 6, the Court previously stated:

> [Factor] 6 asks "whether any remaining issues . . . would be better resolved outside the bankruptcy forum." Assuming the case is not dismissed, the primary remaining issues would be: one, disposition of the hotel; two, the extent of CoreFirst's lien interest in the hotel and adjacent real estate; three, avoidance of transfers to insiders; four, [scrutiny] of debtor's expenditures while in Chapter 11; and five, litigation of the dispute with HHF now pending in district court. The burden placed on a Chapter 7 trustee would be substantial but the probable benefit to the creditor is questionable. The sale of the hotel is better resolved outside bankruptcy, such a sale would likely be at a higher price, be closed more quickly, and be [effected with] lower overall costs.
>
> *If the case is dismissed, the execution of the proposed*

---

[52] *Id*. at 13.

> *work-out agreement would obviate the need for determination of issue 2.* If the case is converted to Chapter 7, the extent of CoreFirst's secured claim would be determined by a bankruptcy court, but CoreFirst asserts it is secured up to the value of the property, even if the leasehold mortgages are eliminated. Therefore, the unsecured creditors would not benefit significantly even if it is determined that CoreFirst's first mortgage lien on the hotel is limited to $7,500,000 as contended by HHF.
>
> As to the third and fourth issues, lien avoidance and [security] of expenditures can be determined only in a bankruptcy court, but the benefit to unsecured creditors of a trustee prevailing would not be significant. The legal issues surrounding the claim of HHF and debtor's claim against HHF are already pending before a court other than the bankruptcy court and will not be affected by dismissal or conversion, except that a Chapter 7 Trustee would replace the debtor as plaintiff. This might be very beneficial to HHF but not necessarily to the estate. HHF might hope that this would be beneficial to it, but this is not a reason to convert the case.
>
> The sixth factor [favors] dismissal.[53]

The italicized sentence of the second paragraph is no longer true, thereby requiring reconsideration of the remainder of the paragraph. An estimate of the amount of CoreFirst's secured claim has been undertaken by this Court, providing an objective estimate for the parties to use when negotiating disputes about the claim, but a final judicial determination of the amount of the claim could be necessary if there is no agreement. Whether that judicial determination is made inside or outside of bankruptcy is a "push." It now appears that CoreFirst's secured claim is less than the value of the real

---

[53] *Id*. at 13-15.

property, but any equity remaining after satisfaction of CoreFirst's claim in a Chapter 7 case would go to Ventura, not to the unsecured creditors. The analysis of factor 6 continues to favor dismissal.

For the foregoing reasons, the Court determines the balance of the factors still supports dismissal even though the work-out agreement has expired since the Court's initial ruling.

The Court again finds that the interests of creditors and the estate are best served by dismissal of this case.

**CONCLUSION.**

Debtor's motion to dismiss and close the case is hereby granted.

The foregoing constitutes Findings of Fact and Conclusion of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**JUDGMENT.**

Judgment is hereby entered granting Debtor's motion to dismiss the case and denying HHF's motion to convert the case to Chapter 7. This case is hereby dismissed. The judgment based on this ruling will become effective 14 days after it is entered on the docket for this case.

**IT IS SO ORDERED.**

# # #

33